## Case No. 1,853.

### BREWSTER v. GELSTON.

[1 Paine, 426.][1]

Circuit Court, D. New York. April Term, 1825.

FEDERAL COURTS — FOLLOWING STATE PRACTICE— NEW TRIAL—APPLICATION—QUI TAM ACTIONS.

1. The common law practice of the state courts, is not considered as the practice of the circuit courts, except as it existed at the pas-

---

[1] [Reported by Elijah Paine, Esq.]

sage of the act of 1789, and so far as it has since been adopted by rule.

[See O'Connell v. Reed, 5 C. C. A. 594, 56 Fed. 531, note.]

2. Although the law of the state requiring the supreme court to decide on a bill of exceptions, before a writ of error is brought, does not govern the practice of this court, yet a bill of exceptions was received as a substitute for a case on a motion for a new trial.

3. No exertions which one may make to procure the condemnation of a vessel under a supposition that he is entitled to a part of the penalty as informer, can constitute him an informer, unless he actually gave the information which led to the seizure.

[See One Hundred Barrels of Whiskey, Case No. 10.526; U. S. v. George, Id. 15,198; U. S. v. Simons, 7 Fed. 709.]

At law. This was an action of assumpsit [by Caleb Brewster] against [David Gelston] the defendant, who was collector of the district of New-York, to recover a portion of a forfeiture which the plaintiff claimed under the collection law, as informer. The declaration contained the money counts, and the defendant pleaded the general issue. It appeared on the trial, that the brig Rambler from St. Bartholomew's, was on the 7th day of March, 1812, boarded, and a man put on board of her at Sandy Hook by the revenue cutter Active, under orders from the collector to send vessels from St. Bartholomew's bound for Amboy to New-York. The plaintiff was master of the Active, but was absent at the time in the interior of the state, and did not return until April. Cahoone, the lieutenant of the Active, boarded the Rambler. He observed by the manifest, that New-London, the port of the Rambler's destination, had been erased, and Perth-Amboy freshly written in its place. He received no information, nor saw any thing to excite a suspicion while on board, that the Rambler was violating any law of the United States. The Rambler came up to New-York, where she was seized on the 9th day of March, and on the 16th a libel was filed against her. The seizure was made in consequence of information given to the surveyor, Schenck, by two of her seamen, Burnham and Lovis, and their testimony was very material in procuring her condemnation. There was no evidence offered at the trial, to show that the seizure was made in consequence of information given by the plaintiff. The only attempt made to show this, was by the testimony of Smith, second mate of the Active, who stated, that the defendant had admitted in conversation, that the Rambler was a prize of the Active, and that her officers would be entitled to a share of the forfeiture if the Rambler should be condemned. He also, and a witness by the name of Clark, testified that Burnham and Lovis had admitted, that they first gave the information of the Rambler's illegal proceedings to the plaintiff. But the testimony of Cahoone, Schenck, Burnham, and Lovis, and documents produced on the trial, and the absence of the plaintiff, showed that this was not the fact, and that the plaintiff did not give the information to the collector. It appeared, however, that the plaintiff made exertions to detain Burnham and Lovis, until the trial of the Rambler, and kept them on board his vessel for that purpose; and was instrumental finally, in procuring their attendance as witnesses. It appeared however, that Schenck made equal exertions for these purposes. The jury found a verdict for the plaintiff, for 2259 dollars and 94 cents, the share of the forfeiture to which he would have been entitled, had the information been given by him. The defendant's counsel, excepted to the charge to the jury, which is fully stated in the following opinion of the court, and the bill of exceptions was now argued on a motion for a new trial, for misdirection of the court, and because the verdict was against evidence. [Motion granted.]

T. A. Emmet and C. Graham, for plaintiff.

D. B. Ogden and C. Baldwin, for defendant.

THOMPSON, Circuit Justice. It has been made a preliminary question, whether this court can hear an argument upon the bill of exceptions taken in this cause. The defendant's counsel consider the case, as coming within the practice of the supreme court of this state, under a statute—1 R. L. 319—which requires, that a bill of exceptions taken upon the trial of a cause, shall be heard and decided upon in the supreme court, before a writ of error is brought. This view of the practice of this court, is however not correct. The judiciary act of 1789—2 Bior. & D. Laws, 63, § 17 [1 Stat. 83, § 17]—gives to the courts of the United States power to make and establish all necessary rules for conducting business in said courts. It has been repeatedly decided by the supreme court, that the 34th section of this act, which requires that the laws of the several states shall be regarded as rules of decision in trials at common law in the courts of the United States, in cases where they apply, does not extend to, or regulate the practice of the courts. The act of congress usually called the process act,—2 Bior. & D. Laws, 73 [1 Stat. 93],—passed about the same time, and the subsequent act of May, 1792,—2 Bior. & D. 299 [1 Stat. 275],—upon the same subject, adopt as the practice of the courts of the United States, in cases at common law, the modes of proceeding then in use in the supreme courts of the several states, subject to such alterations as the said courts respectively shall in their discretion deem expedient, or to such regulations as the supreme court of the United States shall think proper from time to time, by rule, to prescribe to any circuit or district court concerning the same.

It is understood that at an early period, soon after the organization of the courts of

the United States, the judges of the circuit courts adopted the practice of the state courts. This was at a time when the English practice prevailed pretty generally; at all events in this state. And it is believed, that it has not been the course of the circuit courts, to change from time to time their practice, so as to conform it by rule. It does not appear that any rule on the subject has been at any time made by this court. Had judgment been entered upon the verdict, in the term when the cause was tried, I should consider it irregular, and entirely useless to hear an argument upon this bill of exceptions; because this court would have no authority to set aside such judgment. But it appears, that there was an order to stay proceedings, and no judgment has been entered. I do not therefore see any objections to hearing an argument, as upon a motion for a new trial. A bill of exceptions can, technically, only be used on a writ of error: but there can be no good reason why it should not be received as a substitute for a case, showing what took place upon the trial, and as a statement of facts upon which the motion for a new trial is to be founded. Considering the case therefore in this light, it is contended, on the part of the defendant, that a new trial ought to be granted. 1st. For misdirection of the judge; and, 2d. Because the verdict is against evidence.

If the bill of exceptions taken in this case presented for the consideration of the supreme court the construction of the various acts of congress that have been referred to on the argument, it might be deemed expedient to permit judgment to be entered, and to have the cause brought up at once upon a writ of error, as it is probable from what fell from the counsel, that the parties would not be satisfied short of such an appeal. But it does not appear to me, that these questions are presented by the bill of exceptions.

It has been contended on the part of the plaintiff, that the officers of revenue cutters do not stand on the same footing with other informers as to the information given, which shall entitle them to a portion of the penalty or forfeiture. But that the policy, true intent, and meaning of the various laws on this subject, place them on more advantageous ground. That they are not to be considered as officers or servants under the collector, but have independent powers, and are to have their vigilance excited, and rewarded by those extra allowances of a portion of the forfeiture, as much as the custom-house officers. That they have power to seize, independent of the direction or authority of the collector; and that a distinction is warranted by the different provisos in the 91st section of the collection law,—3 Bior. & D. Laws, 223 [1 Stat. 697],—under which the plaintiff's claim in this case is set up.

But the bill of exceptions presents no such questions, nor calls upon the supreme court to express any opinion upon them. That court is not required to go beyond the question of law, raised by the bill of exceptions, or to decide any thing more than whether the court erred in its opinion upon each question of law. How stands the present case? No objection arose as to the admission or rejection of evidence, which being closed, the defendant's counsel insisted generally, that upon the evidence the plaintiff was not entitled to recover, and called upon the judge so to charge the jury. The plaintiff's counsel insisted, that he was entitled to recover upon the said evidence, and requested the judge so to charge the jury. On neither side was the judge called upon for any special direction to the jury, or to express any opinion upon any question of law, or the construction of any act of congress. And the only direction given by the judge to the jury, was, that if they were satisfied that the commanding officer of the revenue cutter gave or sent to the collector, information, that the Rambler had come from St. Bartholomew's, having on board a cargo which was probably the produce of a British island, and that she was bound to Amboy under suspicious circumstances, and contrary to the original destination, as appeared on the papers, and that he had therefore put a prize-master on board; and that such information led to a seizure of the vessel and cargo—in such case the plaintiff was entitled to recover. To this direction, the defendant could certainly make no objection. It was calling upon the plaintiff to make out all that could be reasonably required of him, under the most rigid construction of the law. It was requiring the jury to be satisfied, that the commanding officer of the revenue cutter gave material information to the collector; that he had, in consequence of what he discovered, put a prize-master on board, and sent up the Rambler; and that such information led to a seizure of the vessel. If the evidence warranted the jury in answering affirmatively to these several points of inquiry, there cannot possibly exist a doubt but the plaintiff would be entitled to recover. The seizure in such case would be deemed to be made by him, and he be held responsible for the act. I cannot, therefore, discover any ground to sustain the motion for a new trial, on the ground of any misdirection of the judge as to the law of the case.

But it appears to me, that the verdict cannot be sustained on the other ground, upon which the motion is rested. Were the testimony nearly balanced, I should be disinclined to disturb the verdict. But it appears to me, that the verdict is so obviously and palpably against evidence, that it would be surrendering all control over verdicts on this ground, if the present was permitted to stand. If any thing was done by the officers of the revenue cutter to sustain the

claim of the plaintiff, the commanding officer Lieut. Cahoone, would be most likely to know it, and stood in the best situation to give correct information on the subject. He states, that general instructions had been given by the collector, to put a man on board of all vessels from St. Bartholomew's, bound to Amboy, and send them up to New-York. That he boarded the Rambler, on the 7th of March, 1812, before she came to the point of changing her course for Amboy. That he demanded the manifest, and perceived that the word New-London, as the place of the vessel's destination, had been recently erased, and the word Perth-Amboy substituted in the place. That Capt. Adams, the master of the vessel, informed him, that she was originally bound to New-London, but he was then going to Amboy. That he received no information whilst on board the Rambler, nor did he discover any thing to excite suspicion, respecting the origin of the cargo; or that any thing had been done in violation of the laws of the United States, except that she was from St. Bartholomew's. That he put a man on board of her, and ordered her to proceed to New-York, in compliance with the general order of the defendant as collector. That he came up to New-York two or three days afterwards, and that neither Burnham nor Lovis, made any communication to him relative to the cargo or the proceedings of the Rambler. And it is here to be observed, that no such communication could have been made to the plaintiff; for it is 'in proof, that he was at this time absent on a visit to his friends on the Mohawk river. And besides, Burnham swears that he gave the first information to the surveyor, Peter A. Schenck, within a day or two after the Rambler came up to New-York; and which appears from the testimony of Schenck, to have been on the 9th March, and which at that time was particularly stated and reduced to writing by him, relative to the proceedings of the Rambler, and origin of the cargo. And Schenck agreed with Burnham and Lovis that they should remain here as witnesses, and paid them for their time. No information appears to have come from the officers of the revenue cutter, that at all contributed to the condemnation. The Rambler was not sent up to New-York in consequence of any suspicion entertained by Lieut. Cahoone, but in compliance with the general order of the collector, to send up all vessels from St. Bartholomew's, bound to Amboy. The alteration of the manifest excited no suspicion, nor does it appear that even this was communicated to the collector until after information relative to the cargo was communicated by Burnham to Schenck. Whether the officers of the cutter were bound to obey the general order given by the collector, or whether such order would have protected them, had the vessel been acquitted, is unimportant in the present case. Lieut. Cahoone obeyed the order, and did what he did, in consequence of it. He did not pretend to act on any suspicion entertained by himself, for he expressly denies he had any. He neither did in point of fact, nor even claims to give any information of the least importance. The bill of exceptions sets forth, that it was stated, and admitted by the counsel of the plaintiff and defendant, that the brig and cargo were condemned upon the testimony of Burnham and Lovis. And that their information was first given to Schenck, cannot admit of a doubt; any agency afterwards of the plaintiff in procuring their attendance as witnesses, cannot in any point of view be information, within the sense of the law which will entitle the plaintiff to a portion of the forfeiture. The testimony of Smith, taken in connexion with the explanation of Lieut. Cahoone, and when contradicted in many respects by the other evidence, cannot be considered as entitled to much weight. And there certainly must be some mistake in Clark's testimony, when he states, that Burnham told him, he gave the plaintiff the first information of the proceedings of the Rambler, if he is to be understood as saying that Burnham told him he gave the information to the plaintiff before he did to any body else; for plaintiff did not return from the Mohawk river until the 30th of March; and it is in proof beyond contradiction, that Burnham communicated the information to Schenck on the 9th of March. From an attentive examination therefore of the evidence, I am unable to discover that the officers of the revenue cutter gave any information that led to the seizure, or that in the least contributed to the condemnation.

A new trial must accordingly be awarded, upon payment of costs.